RENDERED:  AUGUST 6, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1335-ME

STUART DANIEL KOUNS                                APPELLANT


APPEAL FROM WOODFORD CIRCUIT COURT
v.             HONORABLE LISA H. MORGAN, JUDGE
ACTION NO. 20-D-00056-001


ROBIN SCOTT KEMPER                               APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; K. THOMPSON, AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Stuart Daniel Kouns (stepfather) appeals from the Woodford Family Court's domestic violence order (DVO), which prohibited him from having contact with his stepchildren, L.M.K. and A.M.K. (children), on the basis that the hearing deprived him of due process and, in any event, there was

insufficient evidence upon which a DVO could be granted.[1]  We disagree that stepfather was deprived of due process but agree that there was insufficient evidence to grant the DVO because there was no reasonable infliction of fear of imminent physical injury on children where stepfather voluntarily stopped having any contact with them more than a year earlier.  Accordingly, we reverse and remand.

Robin Scott Kemper (father) and Pamela Kouns (mother), divorced in 2013.  Father and mother have equal timesharing with children, who are both daughters, spending alternating weeks with them.

About four years before the petition was filed, mother married stepfather and children began spending half their time in mother's and stepfather's home.  More than a year before the petition was filed, mother separated from stepfather.  Mother continues to see stepfather, but stepfather is never at mother's home when the children are there.  It is undisputed that children have not seen or had any communication with stepfather since mother moved out.

On September 22, 2020, father filed a petition for an order of protection on behalf of children.  The statement supporting the petition was, as

---

[1] Normally we refer to parties in domestic violence actions by their names, but in this case, it is less confusing to refer to them by their roles relative to the children.

father noted, written by L.M.K., who was seventeen at the time, and read in pertinent part as follows:

> I fear for my safety! In the recent weeks my family [has] been terrorized by [stepfather]. He has become abusive to my mother throwing her. On that occasion she had gone to leave his house and he did not want her to leave so he grabbed her purse attached to her arm and yanked her to the ground. He had pulled her so hard there was a lasting mark left on her arm. This has happened on more than one occasion. My sister and I fear for our safety and mother[']s life because of his aggressiveness. [Stepfather] has severe anger issues that I have witnessed. I would also like to add that he is an avid daily drinker to the point of intoxication each night. This drinking habit plays into his anger spells that seem to go out of control. A few years back while intoxicated he had shot my mother leading me to fear for my safety s[i]n[c]e that moment. On multiple accounts he has said that "if I want to hurt you I would." S[i]nce these events I have moved out of his house on account of his anger towards me. Upon moving out of his house [stepfather] has acquired several large firearms and weapons. He has s[i]nce joined a militia and for these reasons I am scared for the safety and well being of my family. I beg of you to protect me and my sister from an escalation of his anger. From these recent events of him abusing my mother I believe that this is an urgent matter.

The family court granted an emergency protective order (EPO).

At the hearing, at which both parties were *pro se*, the family court noted it would be hearing from father, L.M.K., and stepfather. The family court asked stepfather if he was planning to call any witnesses besides himself and he stated that he did not plan to do so.

The family court observed that mother was present and noted that because much of the petition was based upon what mother had witnessed where she was a victim, the court might need her testimony. Mother observed, "it's a difficult position for me to be put in" and stated that it would be better if she did not have to testify. Mother was excluded from the proceedings as a possible witness.

The family court instructed that father would need to testify about what he observed and not what his daughter had told him, L.M.K. would testify next and then stepfather would be given an opportunity to respond. The family court instructed the parties that they should try to speak up the best they could during their testimony and seek to not interrupt anyone else's testimony or answer a question directed to anyone else. The family court then proceeded to question the witnesses. We summarize only the testimony which is relevant to the family court's ruling and stepfather's arguments.[2]

Father testified children timeshared with mother at the residence she shared with stepfather until an incident when mother and stepfather had an argument and stepfather turned the water off when L.M.K. was in the shower.

---

[2] Therefore, we do not discuss testimony relating to mother being "shot" except in this brief note here. Everyone agreed the shooting was ruled to be accidental and father and L.M.K. did not observe the incident. Stepfather testified his gun accidentally discharged as he was unloading it and mother was hit by shrapnel.

Father explained that after hearing about it, he told mother he would not let the children live with stepfather anymore. In response, mother moved out and children continued having timesharing with her. Since that time, father denied having any contact with stepfather other than one phone call regarding parenting.

Father explained he filed the petition on L.M.K.'s insistence after a recent incident where L.M.K. called him crying, telling him she heard from a neighbor that stepfather yanked mother to the ground by her handbag and bruised her. Father was concerned about how "torn up" L.M.K. was about the incident.

L.M.K. testified that although she did not have any direct contact with stepfather over the past year, when she is with mother, stepfather calls her mother multiple times a day. She testified that one time, stepfather called mother and asked where L.M.K.'s car was, as he had not seen it when he was driving by mother's home. L.M.K. testified she knew about stepfather's calls based on both what mother had told her and from overhearing phone conversations when they were happening. She explained this comment about her car worried her, so she went to see what stepfather could see from the street and observed her home and where she parked could not be seen unless he was parked on their street.

When asked whether she had witnessed acts of domestic violence between stepfather and mother while she lived with them, L.M.K. testified that stepfather inflicted severe emotional abuse on them by yelling at her sister,

A.M.K., and her until they were crying or left the house. She explained it was so distressing that she and her sister would cry themselves to sleep, afraid that stepfather would hurt one of them or mother.

L.M.K. testified stepfather has a severe alcoholism problem and becomes enraged when he drinks but denied that stepfather was ever physically violent with them or damaged property, explaining that at worst he had thrown stuff in the sink and would become "basically a crazy person yelling." She testified he drinks every night to the point of intoxication.

When the family court asked if stepfather had made any threats, L.M.K. responded: "No, but he said if he wanted to hurt me he would." She could not recall the context in which stepfather made this comment.

Regarding the shower incident, L.M.K. testified that stepfather turned off the water just after she started showering and when she got out, he proceeded to yell at her until she cried. She stated she was crying so hard that she was unable to breathe, and he told her to get out of the house and told her "I was nothing." She explained that at other times stepfather yelled about everything, told her he did not like her, he did not want her in the house and that "I was a waste."

L.M.K. then testified about things her mother told her about stepfather's recent behavior, including that mother is scared because stepfather has joined a militia, and scared because stepfather has so many firearms in the house.

As to the incident which caused the impetus for filing the petition, L.M.K. stated she heard from a neighbor that stepfather was abusing mother and leaving bruises on her. L.M.K. later explained that her mother had a prominent bruise on her arm and she believed her stepfather had to yank her mother hard to cause such a bruise.

L.M.K. testified her little sister cries in the middle of the night because she is scared that if mother divorces stepfather, stepfather will hurt mother. L.M.K. testified that based on stepfather's pattern of behavior, L.M.K. fears imminent harm and believes stepfather could snap at any point.

Stepfather denied ever committing domestic violence against mother or children. He denied he had ever hurt, hit, restrained, shoved, or thrown mother or caused mother to fall. He denied ever grabbing at mother's purse. He explained he did not want to hurt anyone.

However, stepfather did testify about a recent incident where mother left his home at 4 a.m. after waking up from his snoring. He explained he woke up as mother was leaving. He was still half asleep as he told her to give him back the bowl of leftovers she was taking from his home, because she was always taking his bowls and not returning them. He grabbed at the bag that the bowl was in and they "tussled" over it a bit and they became entangled, but he did not intentionally harm her, and she did not fall.

Stepfather testified he had never done anything to cause the children to fear him. He repeatedly said he did not understand why they were in court on a domestic violence action regarding children, as he had no contact with children for over a year. He stated he never called or tried to be around children since mother moved out and had never threatened L.M.K. or stalked her. He also disagreed with L.M.K.'s testimony that mother's home was not visible from the street, noting he could see it from Main Street when he was driving by.

Stepfather testified he has been married to mother for four years. He explained he occasionally visits mother at her home when she invites him over, but he never went there when the children were there. Stepfather stated that both he and mother call each other several times a day because they are in a relationship. He explained that although they are separated, they are trying to work on their relationship and were in marital counseling before the COVID-19 shutdown.

Stepfather admitted that when he lived with mother and children that he argued with mother and L.M.K. sometimes and said that he and L.M.K. had never gotten along and had always "butted heads." He estimated they got into arguments perhaps once a week when one of them had a bad day. As to the incident with the shower, stepfather testified he was frustrated with L.M.K. repeatedly using all of the hot water.

Stepfather admitted he was charged with fourth degree assault in 2011 for an incident regarding his ex-wife, but noted it was diverted. He explained that his ex-wife was intoxicated, he stopped her from leaving while she was intoxicated, and she later dismissed the charge.

Stepfather admitted to drinking some at night, but stated it was not to the point of passing out. He stated that L.M.K. could not know about his current drinking habits as he had not seen her in a year, so she was not around to see him drink.

Stepfather stated he had five firearms and had most of them for years but had purchased a new one in June of 2020. He admitted to being a member of a militia.

Stepfather and L.M.K. were allowed to rebut each other's testimony, which they did. When mother was allowed back in the courtroom, the family court indicated to mother that her testimony was not needed, considering mother's concerns with having to testify.[3] The family court then announced from the bench that it would enter a DVO restraining stepfather from having any contact with children and inquired from mother whether she wanted stepfather restrained from

_____

[3] We acknowledge that the family court was in a difficult position regarding mother's possible testimony. Mother could have had several reasons why she did not want to testify. These could include that she did not want to be made to "choose sides" and upset either stepfather or L.M.K., or she may have been worried about what stepfather would do if she testified he had hurt her.

mother's home all the time, or only when children were there. Mother stated that stepfather never comes over when children are there, and she wanted him to be able to come over when children were not there.

Following the hearing, an order of protection was entered for one year, to expire on October 1, 2021. The family court determined that it was established by a preponderance of the evidence that an act of domestic violence and abuse had occurred and may occur again.

To support its ruling, the family court made detailed factual findings on a docket sheet as follows:

> Pet. filed on behalf of 17 year old & 13 yr old, against Step-Father, due to allegations of dv against Mother, and inflicting fear in home.
>
> Petitioner and Mother share J/C & equal t/s from 2013 Decree.
>
> Approximately one year ago, Mother moved out of Resp. residence when Father refused to send girls back due to d.v. in home.
>
> Court finds Petitioner(s) testimony credible in that Respondent drinks excessively, has significant anger issues, has previously threatened eldest child, yells, becomes irate, engages in intimidating and insulting behavior, and recently got into a "tussle" w/ Child's Mother by grabbing her bag that he did not want her to leave w/ because "she always takes his bowls."
>
> Resp also owns several firearms and recently joined a militia group to "police" protests. Also has prior Assault Charge w/ ex-wife, that she dropped.

-10-

Petitioner also fearful that Resp. is stalking her mother's residence while she is there. Both girls are extremely fearful of Step-Father & believe he will hurt their mother if she were to file for divorce.

Court finds Resp has engaged in a pattern of behavior inflicting fear of imminent harm.

The DVO restrained stepfather from going within five hundred feet of each child's school, father's residence, and mother's residence, with the caveat for mother's residence that "[r]espondent may go to [mother's] residence if agreed to or invited by owner (his current wife, children's mother) ONLY UPON condition none of the protected parties are there for timesharing etc." It also noted: "This order shall not prevent normal ingress/egress through downtown Versailles, for legitimate purposes." Stepfather was ordered to submit to an alcohol and domestic violence assessment and follow all recommendations, and ordered not to possess firearms.

We initially note that father did not file an appellate brief. Pursuant to Kentucky Rules of Civil Procedure (CR) 76.12(8)(c):

If the appellee's brief has not been filed within the time allowed, the court may: (i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (iii) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case.

-11-

"The decision as to how to proceed in imposing such penalties is a matter committed to our discretion." *Roberts v. Bucci*, 218 S.W.3d 395, 396 (Ky.App. 2007). Considering that we are reviewing a case in which children are dependent on father to file a responsive brief and our role in interpreting the application of the DVO statutes so as to "[a]llow victims to obtain effective, short-term protection against further wrongful conduct in order that their lives may be as secure and as uninterrupted as possible[,]" Kentucky Revised Statutes (KRS) 403.715(1), we decline to impose any penalties and will proceed to consider the matter on the merits.

KRS 403.720(1) defines "domestic violence and abuse" as meaning "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members [including a stepchild per KRS 403.720(2)] or members of an unmarried couple[.]" KRS 403.740(1) states that "[f]ollowing a hearing ordered under KRS 403.730, if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur, the court may issue a domestic violence order[.]"

A past finding of domestic violence is not sufficient to enter a DVO; there must also be a finding that an act or acts of domestic violence and abuse may

again occur in the future. *Guenther v. Guenther*, 379 S.W.3d 796, 802 (Ky.App. 2012). As noted in *Rankin v. Criswell*, 277 S.W.3d 621, 626 (Ky.App. 2008), "a DVO can be entered only after the court finds that there is an immediate and present danger of domestic violence[.]"

Pursuant to Kentucky Rules of Civil Procedure (CR) 52.01, "[t]he standard of review for factual determinations is whether the family court's finding of domestic violence was clearly erroneous." *Caudill v. Caudill*, 318 S.W.3d 112, 114 (Ky.App. 2010). "But with regard to the trial court's application of law to those facts, this Court will engage in a *de novo* review." *Buddenberg v. Buddenberg*, 304 S.W.3d 717, 720 (Ky.App. 2010).

Findings supported by substantial evidence are not clearly erroneous. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "Substantial evidence is evidence of sufficient probative value that it permits a reasonable mind to accept as adequate the factual determinations of the trial court." *Williford v. Williford*, 583 S.W.3d 424, 428 (Ky.App. 2019).

Stepfather's first argument is that his due process rights were violated because the DVO was granted without a full hearing, where he was not allowed to make objections, cross-examine the witnesses, or call witnesses himself. As these errors were not preserved below, he seeks palpable error review.

-13-

"A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." CR 61.02. "An error is palpable only if it is 'shocking or jurisprudentially intolerable.'" *Allen v. Commonwealth*, 286 S.W.3d 221, 226 (Ky. 2009) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006)). The requisite manifest injustice may be found where it can be shown there is a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin*, 207 S.W.3d at 3.

Due process in a domestic violence hearing requires that each party have a meaningful opportunity to be heard. *Wright v. Wright*, 181 S.W.3d 49, 53 (Ky.App. 2005). "[A] party has a meaningful opportunity to be heard where the trial court allows each party to present evidence and give sworn testimony before making a decision." *Holt v. Holt*, 458 S.W.3d 806, 813 (Ky.App. 2015). Certainly, "[d]ue process is not satisfied when a DVO is granted without a full hearing, such as when testimony is not presented, or testimony is cut short." *Hawkins v. Jones*, 555 S.W.3d 459, 462 (Ky.App. 2018).

The problem for stepfather is that he never attempted to make objections, asked to cross-examine the witnesses or asked to call witnesses himself.

He wishes for this Court to find that there is palpable error based on the family court making basic comments about courtroom decorum, which he claims to have interpreted to have gagged him from asking for these things. [4] This interpretation of what the family court said and did, strains all credulity. From having reviewed the hearing, it is evident that the family court was pleasant and respectful to all parties, questioned the witnesses in a neutral manner and allowed the parties to freely address the court. Neither party made any objection as to the way the family court conducted the hearing or asked for clarification as to what was allowed or was not allowed.

Stepfather argues that if he could have objected, he would have objected to hearsay statements and this would have changed the outcome of the hearing as these statements did not qualify for any exception pursuant to the

---

[4] It appears stepfather is attempting to manufacture a reason to excuse his failure to make objections, request cross-examination and failure to call mother as a witness in order to get a new hearing. It appears likely that as stepfather was appearing *pro se*, he did not know how to make objections or what objections should be made and did not think to ask to cross-examine the witnesses or know how to cross-examine them. Even in a relatively informal hearing regarding a domestic violence petition, respondents who dispute that a DVO should be issued would be well served by retaining counsel because the issuance of a DVO has enormous significance to the parties involved. *See Wright*, 181 S.W.3d at 52. Unfortunately, "one who is ignorant and inexperienced regarding what is required by the substantive law and rules of procedure may unintentionally prove the veracity of the oft-quoted maxim, 'a man who represents himself has a fool for a client and a fool for a lawyer.'" *Smith v. Bear, Inc.*, 419 S.W.3d 49, 55 (Ky.App. 2013) (quoting *Faretta v. California*, 422 U.S. 806, 852, 95 S.Ct. 2525, 2550, 45 L.Ed.2d 562 (1975) (Blackmun, J. dissenting)). As is evident here, competent counsel could have aided stepfather in opposing the request for a DVO. However, as *pro se* DVO respondents rarely read opinions, this caution is unlikely to reach those who most need to hear it.

Kentucky Rules of Evidence (KRE).  It is well established that a hearing on a petition seeking a DVO is subject to the same evidentiary standards as other hearings, which includes the exclusion of hearsay to which no exception applies. *Allen v. Gueltzow*, 535 S.W.3d 333, 335 (Ky.App. 2017).  If hearsay evidence is wrongfully considered and relied upon, the evidence cannot be of "sufficient *quality* and *substantiality* to support the rationality of the judgment."  *G.E.Y. v. Cabinet for Human Resources*, 701 S.W.2d 713, 715 (Ky.App. 1985) (quoting *Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966) (emphasis original).  However, when a trial court acts as a fact finder, it is presumed the trial court will be able to disregard hearsay statements.  *Id*.  If it is apparent that a trial court relied on inadmissible hearsay in making it decision, "the error in the admission of the unreliable evidence cannot be deemed harmless or nonprejudicial."  *Id*.

While the family court did not say it was going to disregard all hearsay statements, it is apparent from its statements that the family court recognized it could not consider hearsay testimony.  We note the family court told father it would not consider statements father made about what daughter said and observed it might need mother's testimony because she was the person to whom certain things happened.

Furthermore, the family court's factual findings were not dependent upon any of the hearsay statements made during the testimony. Accordingly, even if stepfather were somehow wrongfully prevented from making objections regarding hearsay statements, no manifest injustice occurred as a result.

As to stepfather believing his right to cross-examination was impeded, as explained in *Cabinet for Health and Family Services v. A.G.G.*, 190 S.W.3d 338, 345-46 (Ky. 2006), while civil litigants' due process right to cross-examination is grounded in the Fifth and Fourteenth Amendments, this right is not absolute. There can be no palpable error where the process was fair to each side as neither side cross-examined the other side, and rebuttal testimony was elicited allowing each side to contradict the other's testimony.

We are additionally mindful that L.M.K. was a minor and, as provided in KRE 611(a)(3), the family court was authorized to "exercise reasonable control over the mode . . . of interrogating witnesses . . . so as to: . . . [p]rotect witnesses from harassment or undue embarrassment." This rule gives trial courts "discretion to control the presentation of evidence." *Pendleton v. Commonwealth*, 685 S.W.2d 549, 554 (Ky. 1985). So, while L.M.K. could be cross-examined pursuant to KRE 611(b), we do not fault the family court for deciding not to explicitly ask stepfather if he wished to cross-examine the witnesses where L.M.K. had made it clear she was afraid of stepfather.

As to stepfather's argument that he wanted to call mother and her testimony would have changed the outcome of the hearing, stepfather was informed by the family court that he could call witnesses but indicated that he did not plan to call anyone but himself and never told the family court that he had changed his mind. "Courts are not mind readers. Parties are responsible for being clear in what they seek[.]" *In re Jackson Masonry, LLC*, 906 F.3d 494, 504 (6th Cir. 2018). Having been informed of his right to call witnesses, stepfather had a responsibility to do something to communicate his desire to call mother. There was no manifest injustice where stepfather waived his right to call mother as a witness.

Stepfather's second argument is that the evidence did not support entry of a DVO because there was no evidence that the children were placed in imminent fear of domestic violence or that domestic violence may occur again. He argues there was insufficient evidence to establish that he stalked L.M.K., that domestic violence between him and L.M.K. may occur again or that he committed domestic violence against L.M.K. We examine whether the family court's factual findings would support entry of a DVO, keeping in mind that "to enter a DVO when there is no evidence to support a finding of imminent threat of physical violence is an abuse of discretion." *Hall v. Smith*, 599 S.W.3d 451, 454 (Ky.App. 2020).

Based upon L.M.K.'s observations which were at least a year old, the family court made a credibility finding in favor of L.M.K. and found that "[stepfather] drinks excessively, has significant anger issues, has previously threatened eldest child, yells, becomes irate, [and] engages in intimidating and insulting behavior[.]" Based on stepfather's own testimony, the family court found that stepfather "recently got into a 'tussle' [with mother] by grabbing her bag[.]" The family court also noted stepfather owns firearms, joined a militia, and had a previous charge relating to his ex-wife. The family court focused on the children's fear—fear of stalking, fear of stepfather generally and fear that stepfather will hurt mother—in ruling that stepfather's collective actions were sufficient to determine that he committed domestic violence or abuse against children through the infliction of fear of imminent physical injury.

While there was certainly ample evidence to support most of the family court's factual findings, we discuss where its findings are problematic: Whether a threat was made, whether stalking was established, and whether the infliction of fear of imminent physical injury was established as reasonable.

As to the threat, stepfather argues that L.M.K. denied that he made a threat against her, so it was unreasonable for the family court to find that he threatened L.M.K. While we agree that L.M.K. denied that stepfather made a threat against her, she then clarified he said, "if he wanted to hurt me he would."

We believe the family court could certainly decide that L.M.K. was incorrect in her assessment that this was not a threat, as reasonable people could differ as to their assessment as to whether this was a threat or not. Stepfather's conduct since this "threat" was made, reveals that perhaps it is an accurate statement. Stepfather did not want to hurt L.M.K. and has not done so. However, we do not believe that the family court's interpretation of this statement as a threat is clearly erroneous.

As to stalking, stepfather argues his behavior in asking about the car cannot constitute stalking as it is only one incident, whereas stalking requires two incidents under KRS 508.130(2). He also states that a DVO cannot be granted over fear of stalking.

While the family court did reference L.M.K.'s fear of stalking, it did not make a finding that domestic violence or abuse was committed through stalking. Instead, stepfather's conduct was used to help explain L.M.K.'s fear of stepfather. We do agree with stepfather, however, that his phone call regarding the car does not meet the definition of an act of stalking.

As explained in *Halloway v. Simmons*, 532 S.W.3d 158, 162 (Ky.App. 2017) (internal citations omitted), which summarized what is needed for an IPO to be granted for stalking considering the relevant statutes, which is equally applicable to a DVO for stalking:

> [F]or an individual to be granted [a DVO] for stalking, he
> or she must at a minimum prove by a preponderance of

the evidence that, an individual intentionally engaged in two or more acts directed at the victim that seriously alarmed, annoyed, intimidated, or harassed the victim, that served no legitimate purpose, and would have caused a reasonable person to suffer substantial mental distress, and that these acts may occur again. Additionally, the individual must prove that there was an implicit or explicit threat by the perpetrator that put the victim in reasonable fear of sexual contact, physical injury, or death.

There was only one "act" rather than the two required for stalking. Additionally, the one act that did occur does not qualify as stalking. There was no evidence that stepfather was directing his comment about the car "at the victim" where he was talking to mother on the phone and there was no indication he knew L.M.K. was listening or expected mother to tell L.M.K. about the conversation. Furthermore, L.M.K.'s testimony did not make it clear whether she overheard this particular comment or only heard about it later from mother.

Stepfather's phone call asking where the car was also would not cause "*a reasonable person* to suffer substantial mental distress" and his relatively innocuous question did not contain "an implicit or explicit threat by the perpetrator that put the victim in *reasonable fear* of sexual contact, physical injury, or death." *Id.* (emphasis added.) L.M.K. may have suffered distress and feared injury, but this does not appear reasonable under the circumstances in which children had not had any contact with stepfather in over a year.

This then takes us into considering whether the infliction of fear of imminent physical injury was established and, therefore, sufficient to constitute domestic violence and abuse. While stepfather's conduct toward L.M.K. more than a year earlier could have at that time possibly constituted domestic violence and abuse from the infliction of fear of imminent physical injury, we do not believe that these *stale* actions are sufficient to cause the infliction of fear of imminent physical injury *now* or provide a valid basis to believe that domestic violence and abuse (if it could be found to have occurred) may occur again relative to children.

KRS 503.010(3) states: "'Imminent' means impending danger, and, in the context of domestic violence and abuse as defined by KRS 403.720, belief that danger is imminent can be inferred from a past pattern of repeated serious abuse." As explained in *Fraley v. Rice-Fraley*, 313 S.W.3d 635, 640 (Ky.App. 2010), in applying this definition, the respondent must be the one inflicting the fear of imminent physical injury on the petitioner. Therefore, when a marriage counselor instilled fear of the respondent in petitioner, which was not rooted in actions the respondent took constituting domestic violence and abuse, a DVO was improperly entered. *Id*. Such an interpretation requires that the petitioner's fear must be the result of the respondent's actions, not the petitioner's subjective and unreasonable interpretations of innocuous actions.

Whether the fear is caused by a third party's unreasonable interpretation or petitioner's own unreasonable interpretation of the respondent's actions, we conclude that any unreasonable fear cannot form the basis of a finding of domestic violence. Although the definition of domestic violence and abuse does not state that this fear must be reasonable, our conclusion is supported by four unpublished opinions which interpret this language as necessarily including the understanding that such fear must be reasonable. Indeed, these opinions do not even appear to question the precept that such fear must be reasonable.

For example, in *Robbins v. Meeker*, No. 2016-CA-000302-ME, 2017 WL 242671, at *5 (Ky.App. 2017) (unpublished),[5] the Court explained:

> [T]here is no requirement that a respondent must make an explicit threat in order to meet the requirements of KRS 403.740(1). On the other hand, the petitioner's subjective fear alone is likewise insufficient to meet the domestic violence requirement in KRS 403.740(1). . . . [T]here must be sufficient evidence showing that the petitioner has a reasonable fear of imminent domestic violence or abuse. While [the petitioner] may have subjectively taken [the respondent's] actions as a threat, there was no other evidence to establish that his actions were intended as a threat of imminent domestic violence or abuse. Therefore, we must conclude that there was insufficient evidence in the record to meet the statutory standard in KRS 403.740(1).

---

[5] Pursuant to CR 76.28(4)(c), we may properly consider these unpublished decisions as there is no published opinion which adequately addresses the issue as to whether the infliction of fear of imminent physical injury must be reasonable or if any subjective fear is sufficient.

*See Wenger v. Wenger*, No. 2016-CA-000825-ME, 2017 WL 544625, at *3 (Ky.App. 2017) (unpublished) ("[a]lthough he did not threaten to hit [petitioner] or her mother that day, [respondent's] past pattern of repeated violent outbursts coupled with his intimidating behavior at a location he was explicitly told not to come to, rendered [petitioner's] fear of imminent physical injury reasonable."); *Dasch v. Kelley ex rel. Kelley*, No. 2009-CA-001539-ME, 2010 WL 476001, at *5 (Ky.App. 2010) (unpublished) (noting that to determine the likelihood of future domestic violence, a court is able to consider "the petitioner's reasonable fear of the perpetrator based upon past actions."); *O'Bryan v. O'Bryan*, No. 2007-CA-001538-ME, 2008 WL 2852874, at *1 (Ky.App. 2008) (unpublished) ("as KRS 403.720 provides, a petitioner's fears of physical injury or assault may be used as a basis for granting a DVO. Of course, those fears should be objectively reasonable.").

We also posit that the fear instilled by what another person may be suffering or based on other persons' observations or interactions with a respondent which are not tied to anything the respondent may have done relative to the petitioner (here the children), is also insufficient for a finding of domestic violence as to these uninvolved parties. If stepfather's "tussle" with mother indeed resulted in her being bruised and being scared, stepfather's conduct could fit within the definition of domestic violence through physical injury or the infliction of fear of

imminent physical injury relative to mother. However, the problem is, mother did not file a petition seeking a DVO and given the limited direct evidence before it, the family court at best knew that "something happened" from stepfather's testimony but did not know whether this was akin to "unwanted touching" or rose to the level of constituting domestic violence. *See Telek v. Daugherty*, 376 S.W.3d 623, 628 (Ky.App 2012); *Caudill*, 318 S.W.3d at 115.

The children's fear appears to be rooted in their perceptions of what stepfather may or may not have done to mother, or may do to mother in the future, rather than in any reasonable perception of current danger relative to themselves. While we can imagine scenarios when actions taken against or threats made against one person could be done with the intent to cause fear to another, warranting a DVO, that is not the situation here. We note that father never indicated he was scared of what stepfather might do to children but instead testified he filed the petition at L.M.K.'s insistence because she was upset about what stepfather had done to mother.

We do not believe that possible recent domestic violence to mother, when all the witnesses agree that the children have not seen or talked to stepfather for a year, can reasonably cause the infliction of fear of imminent physical injury to the children. While an EPO and DVO may have been warranted to protect the children right after mother separated from stepfather and children did not know

-25-

whether stepfather would try to see them, the success in mother's separation from stepfather in keeping children away from stepfather militates against them having any reasonable fear of imminent physical injury, especially where children were never victims of any physical injury.

We believe father and mother exercised appropriate protective actions in father demanding that mother not exercise timesharing in the house she shared with stepfather and mother choosing to live apart from stepfather so that she could spend time with children away from stepfather. We appreciate the fact that stepfather respected this arrangement. This appears to have been a reasonable and workable solution for all concerned and to have amply protected the children without any need for court intervention. The separate living arrangements and the elapse of time since there has been any contact between stepfather and children also negate the risk that domestic violence and abuse may occur again relative to the children.

Although, indeed, it likely feels very personal to children that mother may be being harmed by stepfather and we acknowledge that L.M.K. has legitimate concerns about stepfather's conduct towards her mother, *see Buddenburg*, 304 S.W.3d at 721, the fear of what stepfather may do to mother when children are not there is not properly addressed through a DVO protecting children. We emphasize, however, that the EPO/DVO process is available to

protect mother and/or children should stepfather engage in any domestic violence or abuse against them. If stepfather is indeed committing domestic violence against mother, we urge her to seek help. If the hearsay statements about what L.M.K. related occurred to mother are correct and mother were to testify consistently to them, this could warrant a DVO.

As to children, should stepfather engage in future actions which reasonably cause the infliction of fear of imminent physical injury to children, they can certainly file for immediate protection.

Accordingly, we reverse and remand the Woodford Family Court's DVO for it to enter an order dissolving the DVO as there was insufficient evidence for its entry.

ALL CONCUR.

BRIEF FOR APPELLANT:                    NO BRIEF FOR APPELLEE.

Joshua A. K. McWilliams
Versailles, Kentucky